Next case is Google versus Network One technology. 2017-13-79, Ms. Honor. Good morning. I've reserved three minutes for my rebuttal. Good morning. May it please the court. Claim construction is the key issue in this appeal, and the board's construction of the term machine-readable instructions is inconsistent with the intrinsic evidence and should be reversed. This patent describes how to identify what it calls a work, an example is an advertisement, and to use the identification of that work to look up information used to provide an action to a user. The example that this specification gives is a user watching an ad might want more information about the product and use its cell phone to request a phone number that is then automatically dialed to the provider of the advertisement. Did you have a question? No. That's described in the specification. If I could point you to the patent itself, the intrinsic evidence, in column 22, which is at the bottom of appendix 49. I'll start with the when a user at line 61. So this is the example that I just gave you. I'm sorry, which column are you saying? I'm in column 22, the bottom of page appendix 49. When a user query is received, the time, channel, and geographic information are used to retrieve the corresponding unique identifier, so that's the system identifying what the ad is, and using that unique identifier to access a second database that contains information associated with the identified work. And then it gives some examples in the next paragraph. There's a second database, and entry 1000 in this second database is depicted in figure 10, which shows that associated with the identifier is the name of the product, product category, several data fields here, manufacturer, website. That next sentence starting at line 2 in column 23. Many other data fields are also possible. Such additional data fields may include fields that indicate what actions should be taken on behalf of the requesting user. And the patent goes on to provide four examples of those data fields and those actions that could be performed for the user. And they include the first one there, simply redirecting a request to an associated website or initiating an e-commerce transaction or providing an associated telephone number that may be automatically dialed if the querying device is a cell phone. So that's the example I just gave you. Two of the examples from that database, those data fields, are recited specifically in dependent claims 16 and 17, which appear on the next page of the patent at appendix 51. And they specifically recite a hyperlink to a URL and instructions to dial a telephone number. And that's the subject matter that I just read to you from column 23. The problem comes at the board's construction of the term machine-readable instructions, which appears in those claims, which say that the machine-readable instructions comprise a hyperlink or instructions to dial a telephone number. The board, however, construed machine-readable instructions to mean code or pseudocode that is executable by a computer processor. That construction is so narrow that it does not cover the examples given in claims 16 and 17, and it's inconsistent with the specification. I'm not sure why it doesn't encompass what's in 16 and 17. And on the assumption that that's identical to what's at the top of column 23, why there's any inconsistency? Well, the inconsistency is actually in the text of 23 itself, which describes those examples as data fields in a database. And so the specification specifically calls those out as examples of just data. It doesn't say anything about them needing to be limited to code or pseudocode. And likewise, the instruction to dial a telephone number in 17, the hyperlink to a URL, there's nothing that indicates those have to be code or pseudocode. And that is why the board's construction is inconsistent with the claims and the intrinsic evidence. Is it possible to package code or pseudocode that's executable by a computer processor with data, with text? So I think that's one of the primary arguments from the other side, is that the hyperlink or the telephone number is something that rides along with other stuff that is the code itself. But that's inconsistent with column 23, which describes those things simply as data fields. And it doesn't just say a URL or a phone number is a data field. It says things like redirecting a request to an associated website. That's exactly what a hyperlink does. Or providing an associated telephone number that may be automatically dialed. So it's not simply limiting. It lists other data fields, but the specification is not limiting those things to just data that is along with something else. I know this is a dangerous thing to do, but if you were to just look at the word machine-readable instruction outside the context of the specification, I already said that's a dangerous thing to do. But this construction, code or pseudocode, that's executed by a computer processor, that would seem like the ordinary instant reaction definition you would have for such a term. Is that fair to say? I think there's evidence in the record that would support that as one of maybe many different ways to express machine-readable instructions and to that sort of outside of the patent. We wouldn't think data fields, for example, would be machine-readable instructions. Again, divorced from the specification. If you were divorced from the specification, they've pointed to evidence in the record and other patents that use machine-readable instructions as something that is code or pseudocode that has to be executed. They've argued that that is a term of art and therefore we're stuck with it here. And the problem is that that's not what this patent is about. Machine-readable instructions, how to generate machine-readable instructions, code, pseudocode, none of that appears in this patent. What this patent is really about is all the different ways you could use to identify the advertisement. So it's got columns and columns about different ways, whether you look at the ad and you pull out feature vectors and compare them to a database of feature vectors or you see, as in the example I read, when the ad was broadcast or where. That's really what the patent is about. And so here, when machine-readable instructions appears only in the claims and only in these couple of places, we have to make sure that whatever the broadest reasonable interpretation is is broad enough to cover what's here. And to your question, Judge Toronto, about why those things couldn't be code or pseudocode... Why would we have to make sure that that's broad enough to cover what's in the spec when the spec doesn't use that term? It doesn't use the term machine-readable instructions. The claims, though, those two claims that I pointed to, describe specific actions that are machine-readable instructions. Right, but they're dependent on... I guess all of the claims say... We may have other... Not the claims. The patent owner may say, we may have a variety of claims. I don't even know if there are... In fact, I guess I do know that there's a family of patents because there was an earlier, still pending, litigated case. On other related patents. And I haven't looked at those, but why aren't they entitled to say, this particular continuation application, or maybe this particular patent, we're going to take all the stuff we did about identifying works and then associating things, and we're going to now limit this to machine-readable instructions for using all of that. So these eight lines in the spec, when divorced from machine-readable instructions, may not be covered by these claims, but so what? Well, but the claims do say that machine-readable instructions comprise two of those examples. Right, but the claim language is quite easily understood as referring to machine-readable instructions, either for two reasons, which I think are the two reasons that were given in the red brief. One, they may actually be machine-readable instructions. The instruction, dial the phone number, or the instruction, go to this URL. And in any event, all the claims, what is it, 16 and 17 and the 30 series counterpart, all they say is you have to include that stuff. That doesn't mean that those have to be the machine-readable instructions. I think the tiebreaker here is the fact that we're under the broadest reasonable construction and that the claims use the word, the dependent claims use the word comprise. And so it could be either. It could be either those are a part, as Judge Chen suggested before, those are a ride-along with some other code that's there, although that's not supported anywhere in the specification, or it could be that those are examples of the machine-readable instructions, in which case there's nothing in the record to suggest that a hyperlink is code or pseudocode. It's machine-readable. It's readable by a machine. What it is is it maps usually an icon or a word. You've seen them maybe in an email or a document. It's kind of blue or purple, it's underlined, and when you hover over it with your mouse, it turns into a hand so you can click it, and then you're moved to that location, whether it's a website or a place in the document. The difference, though, is when the hyperlink is sent, it's not the hyperlink, it's actually the browser software on the user's computer that executes that, just like in the record, that's an example that's extra record, but in the record, there's an example given by Network One's expert of an email, and he says that an email is just data. It's not code or pseudocode, and that's because when it's sent on the user's computer, your email outlook program, or whatever email program you use, is what actually runs and displays the email. It's the same thing as a hyperlink. When it's sent, it's not the hyperlink that has the code in it. Hyperlinks aren't code. What it is is the browser on the user's computer. So even setting aside, which I don't think you can do properly, but even if you want to set aside that those two examples appear in the specification and are described as data fields, the terms themselves in the claims, the instruction to dial a telephone number, the example in the specification says send the phone number. When the cell phone gets it, the cell phone is what's dialing the phone number. It's not some code that's sent along with the phone number, and that's consistent with what's described in the specification, that those things, because it's the broadest reasonable interpretation, they have to be examples. They might be parts, too, but they have to be examples of machine-readable instructions, and neither of those things is, and it's confirmed when you look back at the specification. It also demonstrates why the prior art discloses the machine-readable instructions, and that was the position that Google took in the petition, was that whatever the construction is of machine-readable instructions, just like, and the references we used, all three of them, Ferris, Goldstein, and Filia, they all parallel almost exactly the examples here in the specification, in particular for the hyperlink and the telephone instructions. Those references give much more detail about how to redirect a URL to a, or an advertising URL to a manufacturer, or how to send a telephone number to get the telephone interface by the user to dial that phone directly. And so the scope of the claims needs to be broad enough to cover what's in the claims themselves, the intrinsic evidence, and because the board's construction contradicts the intrinsic evidence, it should be reversed. I'll save the remainder of my time unless you have other questions. Please, we'll save it for you, Ms. Honor. Thank you, sir. Mr. Jacobson. Thank you. May it please the court. This appeal turns on the board's construction of the claim language, machine-readable instructions. Google does not seriously dispute on appeal that below, the board made factual findings that this is a term of art. Google's own expert agreed that is true. And to one of ordinary skill, it means code or pseudocode executable by a computer. Right. Now we're trying to understand it in the context of this patent. And nowhere else in the patent does it actually use the magic words machine-readable instructions, nor is there any embodiment that seems to suggest how machine-readable instructions would be introduced into any of the embodiments to somehow carry out whatever the goals of the invention are. So could you, I guess, somehow translate for me what the machine-readable instructions are actually doing since they're nowhere referenced in the spec? I mean, as Ms. Arnor pointed out, there's embodiments talking about data, right? Data getting sent over. But where is the machine-readable instructions popping up in the spec? Let me show you an example, Your Honor. And in the context of that example, I'll explain what the machine-readable instructions are doing and how those are different from just the data fields that the patent describes stored in this database. It's going to be in the specification in column 7. That's on appendix page 42. The relevant part starts at line 49. And what is described is the URL associated with the Ford Taurus car together with the instruction to translate the query into the associated URL. What this is saying is you have here a URL. That's just data. That's just a website, www.ford.com. But that's not all you have. You also have an instruction to a computer to take that URL and translate it into a website. That's what the claim language requires to generate and then provide to the user device, that instruction, not just the data field. Isn't that inherent any time you send a URL link over? No, Your Honor. There's a difference between a URL and a hyperlink to a URL. That's why the claims recite hyperlink to a URL. OK. Well, hyperlink. Any time you send a hyperlink, you're sending these kinds of instructions? In most cases I'm aware of, if you do actually generate and send a hyperlink, that would be machine-readable instructions, Your Honor. I agree. But that's not what Google's asserted prior article. Google's asserted prior article. No, I understand your technical arguments for why Google's arguments fail. But I'm just trying to now understand what is really being accomplished by machine-readable instructions. And I guess from this reference in the spec, you're saying it's really nothing more than the instructions that come along with any old hyperlink. Your Honor, instructions that come with a hyperlink would be an example of machine-readable instructions. But that does accomplish something important that tells the computer using HTML tags to take this web address. You didn't invent the idea of sending along these instructions so that the URL can all of a sudden be clickable to access the website or a phone number. We did not invent the concept of a hyperlink or a phone number. What is inventive about these claims is it does this in a way that's different from the prior art. In the prior art, what you would do if you wanted to use a hyperlink is you would just send the URL from the computer system to your user device. And all the instructions, all the software you needed to turn that into a hyperlink, that would be resident on the device. That's what Google's filia reference did. These claims claim something innovative by reversing that. Now we're actually generating the instructions for the hyperlink at a remote computer and sending that along to the user device. That was counterintuitive because now the message you're sending is more complicated. It involves at least some code or pseudocode. It has to work together with everything that's already on the device. When you're just sending... I guess I'm lost. What is new about instead of sending the URL, you're sending a link with the URL? What's new, Your Honor, is instead of sending just the URL, instead of sending just www.google.com, you're sending the actual HTML code to create a hyperlink. That would be an anchor tag, which is the A symbol, the variable href, which tells you what the URL is going to link to, the text, and a closing anchor tag. You're sending a little bit of code or pseudocode, machine-readable instructions, instead of just sending the data and relying on the instructions already being resident on the device. That's one inventive aspect of these claims. I guess you're saying Ferris doesn't teach this. Ferris just has data. Do you want to buy this, and then you press a button on the remote control? Correct, Your Honor. Ferris just sends an advertisement text, for example, buy this power drill at a price, and all the software that's needed to take that and do something with it, all the instructions, is already present on the Ferris device. That's why, to attempt to prevail below, Your Honor, Google had to advance an implicit construction that was contrary to the meaning of this term of art. Google had to imply that any time you send data, that's an instruction. That's because all of Google's references, the only thing that the computer system provided to the remote device, is just data. No instructions, no code or pseudocode. The problem with that, as the board recognized, is that it's directly contrary to what this term, this claim term, means to one of ordinary skill. That was established by the admissions of Google's own expert, who agreed with our expert that when you have machine-readable instructions, it's a term of art, and what that tells one of ordinary skill is that we are providing code or pseudocode, not just data. That's why it's instructions to a machine. Would it be a different case if they had added filial to the proposed rejection of Claim 1? No, Your Honor, and the reason is that all that is sent in filial, from the filial remote computer to the filial user device, is just a URL. Nowhere does filial teach sending the additional code or pseudocode that would make it a hyperlink. That's because filial did it the old way. You just sent the data, and you relied on software on the user computer to have all the instructions you needed to take some action with that data. Do all of the pieces of prior art involve some kind of human-taken step on the receiving end to carry out the action, or are some of them actions that are carried out without additional human intervention, but the instructions for doing so are already resident on the receiving device, just not sent? There's examples of both, Your Honor. Ferris describes some human action as needed, for example, clicking the Buy button. In filial, you've got instructions already present on the user device, which take the URL and take it to a website. In either case, are you doing what the claims require, which is generating and actually providing the machine-readable instructions to the user device? Mr. Jacobson, when I look at this patent, I see 11 columns of prior art references. One cites references to the patent office pursuant to a duty of disclosure to disclose references pertinent to the patentability of the invention. 11 columns of references. How can this possibly be non-obvious? Because, Your Honor, the prior art that's disclosed demonstrates how what was done in the prior art is the opposite of what was done in this patent. In these references, for example, Google's reference, what you're doing is sending data, not instructions. And that actually told one of Ordinary Scale that it would be counterintuitive to send instructions because when you're just sending data, it's simple. You don't have to worry about the code you're sending working together nicely with the code on the device. That's why it was done the opposite way in all this prior art. One inventive aspect of this patent is it turned that on its head. It did the opposite of what the prior art did. That would have seemed like a bad idea to one of Ordinary Scale because now what you're trying to transmit is more complicated. You could have reliability problems and now you need to be sure that the little code or pseudocode that you're sending is going to work with all the software on the device. That's harder to do when you are sending code or pseudocode that's separate from the software already present on the device. Do you think citing 11 columns of 2 or 300 references is consistent with the duty of disclosure? Certainly, Your Honor. What is the standard for the duty of disclosure? Your Honor, I want to... Other than I found a mountain of references, now I'm going to send them all to the examiner and tell the examiner to get to work. Your Honor, I want to recite it correctly. This was not an issue raised on this appeal, but I'll try my best. My understanding is that you need to disclose references that are material, and that means references that could actually potentially result in a finding of unpatentability. Here, Google's references cannot, and indeed the board... But you, your side, your firm, submitted hundreds and hundreds of references to the examiner. So I guess whoever signed off on that believed that all of these references, hundreds of references, were material? I would disagree with that, Your Honor. Your duty is to submit references that have some reasonable possibility of being material, and it's wise to submit more references to disclose more so the board, so the patent office can consider more in deciding whether or not to issue your patent. Is it... I don't think either side here has suggested that there's any relationship between this case and the other IPRs that were argued not too long ago. I don't remember exactly. Does everybody agree that they're unrelated? I agree, Your Honor. Those involve different claim limitations, and I don't see any overlap between the issues here. Your Honor, affirming the board's construction of machine-readable instructions is dispositive of this entire appeal, and the reason is what we just discussed. All of Google's references did not send code or pseudocode. They sent just data. That's why below, Google made no effort to actually try to demonstrate that in any of these references, what you're sending is code or pseudocode, because Google could not. Instead, what Google had to do to try to win is advance a implicit construction that was inconsistent with what this claim term means to one of ordinary skill in the art. Did Google make an argument in its petition that even if neither Ferris nor the other prior art actually teaches the sending of code, it would have been an obvious variation to include the quite small amount of code, HTML tags and whatnot that you were describing that would be sending a hyperlink and therefore come with it? No, Your Honor. I think Your Honor meant to say, did Google argue that even if Ferris sends only data, it would be obvious to modify that to include code? The answer is no. Google depended entirely on this implicit construction that sending data is machine-readable instructions. And so what we're left with is a factual finding, a factual finding supported by more than substantial evidence, the admissions of Google's own expert, the credited testimony of our expert, a number of objective sources, other patents, Google's own patents which use machine-readable instructions to refer to code or pseudocode, and dictionary definitions from well-known dictionaries like the Microsoft Computing Dictionary which define this as code or pseudocode. And there is no conflict with these dependent claims for the two reasons Judge Toronto, you pointed out. I was just reciting your reasons. Thank you, Your Honor. I agree with the reasons we recited. First, that a hyperlink is code or pseudocode. It's HTML, and Google will not deny that. They can't deny that you can code a hyperlink using HTML tags. There's also support in the record for that, Your Honor. Google didn't raise this dispute below, but there is some evidence on it. It's in Dr. Kripis' declaration. This is on appendix page 1970. This is a patent owner's expert. Here Dr. Kripis is explaining why in Google's primary reference, Ferris, all that's being sent is data, not code or pseudocode. And what he does in footnote 8 is he contrasts that with something that actually could be code or pseudocode, something that could be machine-readable instructions. And what he says is, Ferris neither expressly states, nor is it inherent, necessarily present in the reference, that a transmitted message is a string that is marked with a tag, such as HTML, to be processed by the program that renders the message. A string marked with a tag in HTML is exactly what a hyperlink is. You have tags that instruct the computer to do something with the URL. That's the code that makes it machine-readable instructions. So Filial doesn't send a hyperlink? It does not, Your Honor. It just sends a URL. Just a URL. And you can actually see that in Google's petition. Google actually points to the fact that Filial just sends a URL. This is on appendix page 123, Google's petition. Google is quoting from Filial. The very last sentence, Google quotes a sentence from Filial. This is what Google points to as purported machine-readable instructions. And Google quotes, by detecting the data message... I'm sorry, we're on A123 right now? We're at the very bottom of the page, Your Honor, the last sentence. Oh, all right. It begins by detecting the data message. And what Google quotes is, by detecting the data message buried in a video signal used to advertise a product, the phone number for the vendor supplying the product may be decoded. I apologize, Your Honor, this is Goldstein. Yeah, this is Goldstein. Yes, it's on appendix 119 is what we're looking for. And it is the very last sentence that's on the bottom of this page that spills over to the next page. It says, ARS 308 returns a URL corresponding to advertiser server 312 to PC 302. What is being sent from this remote computer, the advertiser server, is just a URL. And that's why Google points to just a URL. Nowhere does Filial disclose actually providing hyperlink code to the remote device. And that's because in the prior art, it was considered a better idea just to send the data and let all the instructions remain resident on the user device. Thank you, counsel. Thank you, Your Honor. Ms. Honor has a little rebuttal time. I'd like to first address the example that Network One gave at column 7 in the patent as the purported place where the support for the idea that it requires code or pseudocode. In column 7, which is on appendix 42, as the Network One counsel pointed out around line 50, what is sent is a URL associated with the car that's advertised, together with the instruction to translate the query into the associated URL. It doesn't say that that has to be code or pseudocode. Instead, that is the hyperlink, and the claim says a hyperlink to a URL. Where the hyperlink activity is described in the specification, it is redirecting a user, again on column 23, redirecting a user to the website. That is consistent with the argument that machine-readable instructions does not have to be code or pseudocode, that it can be a hyperlink, which is data that can be read by a machine that can cause the action to happen. And that's what's required in the claim language, in the independent claims. The machine-readable instructions have to be used in performing the actions. It doesn't say that it has to be the only code that is used. There can be a browser or a cell phone interface or something like that on the user device. It's paralleled by the telephone claim, where in column 23, it says what happens is providing an associated telephone number that may be automatically dialed if the querying device is a cell phone. It doesn't say that somehow there's code explaining to the cell phone how to dial a cell phone. It says that the cell phone number is sent and that that is what causes the action to be taken. And all the claims say is... But that's not what the claim says. The telephone number claim says... Has an instruction. Instructions. That's right. And in the specification, that's the only example it gives. It doesn't describe anywhere in here, despite the argument that it was a groundbreaking invention, it doesn't describe anything else. And so without the evidence that would show that it has to be computer code or pseudocode, the broadest reasonable interpretation standard means that it has to be more than that. It has to be both, because the specification supports an interpretation of both, and those two dependent claims do. Is it possible that the column 23 reference to providing an associated telephone number that may be automatically dialed if the querying device is a cell phone, would one expect a cell phone, when receiving a phone number, to have software on it, like browser software that translates a URL into a hyperlink to have automatic... That sounds a little dangerous. It's actually exactly what's in Goldstein. So the reference that we cite that talks about the automatic telephone... It talks about the telephone interface on the user's device, receiving the phone number and then calling in response to the ad. That's exactly what the prior art reference describes, that the cell phone has... It's a universal remote in Goldstein, that it has a telephone interface on it that automatically dials the number. And actually, to clarify, FILIA does describe sending more than simply a URL address. And if I can point you to that briefly, at Appendix 1538, which is cited in our petition, the data exchange in FILIA, the redirecting. There's a URL that's sent in several places. The place that we're pointing to in 1538... And it's shown in Figure 3, if you prefer to look at a figure. But it's the data path where an advertiser server... And I'm looking at line 14. The advertiser server address URL is obtained from the database. It and the request for the particular advertiser product information is automatically routed back through the web browser on the user's device and then to the advertiser server to retrieve the advertiser product information for the user. Ms. Honor, it may not be machine readable, but it is certainly visible. Your time is up. It is. Thank you. We'll take the case under advisement.